[Cite as *State ex rel. Heilman v. Indus. Comm.*, 2023-Ohio-3073.]

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

State ex rel. Patricia A. Heilman, :

        Relator, :

                                    No. 21AP-353

v. :

Industrial Commission of Ohio et al., : (REGULAR CALENDAR)

        Respondents. :

D E C I S I O N

Rendered on August 31, 2023

**On brief:** *Plevin & Gallucci Co., L.P.A., Frank Gallucci, III,* and *Bradley Elzeer, II, Flowers & Grube, Paul W. Flowers, Louis E. Grube,* and *Melissa A. Ghrist,* for relator.

**On brief:** *Dave Yost,* Attorney General, and *Natalie J. Tackett,* for respondent Industrial Commission of Ohio.

IN MANDAMUS ON OBJECTIONS TO THE
MAGISTRATE'S DECISION

BOGGS, J.

{¶ 1} Relator, Patricia A. Heilman ("claimant"), brings this original action for a writ of mandamus ordering respondent, Industrial Commission of Ohio ("commission"), to vacate its April 14, 2021 order that denied her C-86 motion for payment of loss-of-use-compensation, pursuant to R.C. 4123.57(B), for the total loss of use of both arms and legs, total loss of vision in both eyes, and total loss of hearing in both ears by her deceased husband, Arthur J. Heilman ("decedent")[1], and to enter an order granting such compensation.

---

[1] Decedent was injured on April 4, 2019, in the course of and arising out of his employment with respondent Riverside Main Industries, Inc. He died two days later as a result of his work-related injuries. Claimant's request for death benefits was paid on October 15, 2019.

{¶ 2}    Pursuant to Civ.R. 53 and Loc.R. 13(M) of the Tenth District Court of Appeals, the court referred this matter to a magistrate who issued a decision, including findings of fact and conclusions of law, which is appended hereto.  The magistrate concluded that medical reports from John C. Mareska, M.D., cannot constitute "some evidence" to support the commission's order denying claimant's motion for loss-of-use compensation.  Dr. Mareska conducted a review of decedent's medical file and opined that claimant did not establish that decedent suffered a total loss of use of his arms and legs, total loss of vision in both eyes, or total loss of hearing in both ears.  The magistrate determined that Dr. Mareska's reports, on which the commission "pervasive[ly]" relied in its decision, did not comply with the holding in *State ex rel. Wallace v. Indus. Comm.*, 57 Ohio St.2d 55 (1979), inasmuch as Dr. Mareska, a reviewing physician, did not accept the objective findings of the coroner, an examining physician, in rendering his opinions.

{¶ 3}    Therefore, the magistrate recommends that this court grant a limited writ of mandamus, directing the commission to: (1) vacate its order denying claimant's motion; (2) determine, without reliance on Dr. Mareska's reports, whether claimant has established decedent's loss of use of both arms and legs, loss of vision in both eyes, and loss of hearing in both ears, pursuant to R.C. 4123.57(B); and (3) enter an order granting or denying compensation accordingly.

## I. OBJECTIONS

{¶ 4}    The commission raises two objections to the magistrate's decision, both concerning the magistrate's treatment of Dr. Mareska's reports.  The commission first argues that the magistrate improperly found that Dr. Mareska's reports did not comply with the holding in *Wallace*.  Next, it argues that the magistrate improperly reweighed the evidence and substituted his interpretation for the commission's interpretation of Dr. Mareska's reports.

{¶ 5}    Dr. Mareska did not examine decedent.  Rather, after claimant filed her C-86 motion for loss-of-use compensation, the Bureau of Workers' Compensation ("BWC") requested that Dr. Mareska review the decedent's medical file, which included decedent's hospital records, the Lucas County Coroner's case summary and autopsy report, and the report of an independent medical review by Donato Borillo, M.D., who had opined that decedent had suffered a loss of use of both arms and legs and a permanent loss of vision.

{¶ 6} Dr. Mareska issued a report dated April 26, 2020, in which he concluded, "There is no valid clinical documentation of [decedent's] loss of functions of arms, legs, hearing, or vision." (Dec. 6, 2021 Stipulated Record; Mareska Report at 20994-R54.) The magistrate accurately summarizes the findings and conclusions in that report in section 8 of his findings of fact. In response to questions subsequently posed by BWC, Dr. Mareska issued a multi-page addendum to his report on March 8, 2021, which the magistrate accurately summarizes in section 13 of his findings of fact. In preparing his addendum report, Dr. Mareska additionally reviewed the report of an independent medical review by Patrick Kelley McGriff, D.O., whose review of decedent's medical file led him to disagree with Dr. Mareska's opinions, to agree with Dr. Borillo's opinions, and to opine that claimant's motion should be granted for loss of use of both arms and legs and bilateral loss of vision and hearing. In his addendum report, Dr. Mareska explained a statement in his April 26, 2020 report that the autopsy findings were inconsistent and/or incongruent, and he stated that he disagreed with the conclusions of Drs. Borillo and McGriff that decedent suffered loss of use of his limbs, vision, and hearing prior to his death.

{¶ 7} Claimant has also filed "limited objections" to the magistrate's decision. Claimant does not object to the magistrate's findings of fact or to the magistrate's legal conclusion that Dr. Mareska's reports could not constitute "some evidence" in support of the commission's order, but she objects to the magistrate's recommendation that the court return this matter to the commission for a redetermination of her motion for loss-of-use compensation. Claimant maintains that a limited writ is legally improper to remedy the commission's abuse of discretion, when all the remaining evidence supports her claim for compensation. She argues that this court must instead grant a peremptory writ of mandamus ordering the commission to grant her motion.

## II. STANDARD OF REVIEW

{¶ 8} Because the commission and claimant have filed objections to the magistrate's decision, we independently review the record and the decision to ascertain whether "the magistrate has properly determined the factual issues and appropriately applied the law." Civ.R. 53(D)(4)(d).

{¶ 9} To be entitled to a writ of mandamus, claimant must demonstrate by clear and convincing evidence that she has a clear legal right to the relief sought, that the

commission has a clear legal duty to provide that relief, and that she lacks an adequate remedy in the ordinary course of the law. *See State ex rel. Poneris v. Indus. Comm.*, 10th Dist. No. 05AP-111, 2005-Ohio-6208, ¶ 11, citing *State ex rel. Berger v. McMonagle*, 6 Ohio St.3d 28 (1983).

{¶ **10**} Generally, a clear legal right exists when the relator establishes that the commission abused its discretion by entering an order that is not supported by "some evidence" in the record. *State ex rel. Elliott v. Indus. Comm.*, 26 Ohio St.3d 76, 78-79 (1986). When there is no evidence in the record on which the commission could have based its factual findings, the commission has abused its discretion and mandamus is appropriate. *State ex rel. Tradesmen Internatl. L.L.C. v. Indus. Comm.*, 10th Dist. No. 20AP-572, 2022-Ohio-2935, ¶ 7, citing *State ex rel. Teece v. Indus. Comm.*, 68 Ohio St.2d 165, 167 (1981). On the other hand, " '[w]hen an order [of the commission] is adequately explained and based on some evidence, there is no abuse of discretion and a reviewing court must not disturb the order.' " *State ex rel. Waste Mgt. of Ohio v. Indus. Comm.*, ____ Ohio St.3d ____, 2022-Ohio-4581, ¶ 14, quoting *State ex rel. Aaron's, Inc. v. Ohio Bur. of Workers' Comp.*, 148 Ohio St.3d 34, 2016-Ohio-5011, ¶ 18.

## III. ANALYSIS

{¶ **11**} R.C. 4123.57(B) authorizes the payment of scheduled compensation to an injured worker for the total loss of a body part, including the arms, legs, eyes, and ears. "Loss" is not limited to amputation, but also encompasses the permanent loss of use of the affected body part for all practical intents and purposes. *State ex rel. Wyrick v. Indus. Comm.*, 138 Ohio St.3d 465, 2014-Ohio-541, ¶ 10, citing *State ex rel. Moorehead v. Indus. Comm.*, 112 Ohio St.3d 27, 2006-Ohio-6364, ¶ 13, and *State ex rel. Alcoa Bldg. Prods. v. Indus. Comm.*, 102 Ohio St.3d 341, 2004-Ohio-3166, ¶ 12. R.C. 4123.57(B) neither specifies a required length of time of survival after a loss-of-use injury before benefits are payable nor requires that an injured worker be consciously aware of the loss of use to qualify for loss-of-use compensation. *Moorehead* at ¶ 14, 16. The claimant bears the burden of proving entitlement to compensation with medical evidence that demonstrates the total loss of the relevant body part for all practical purposes. *State ex rel. Koepf v. Indus. Comm.*, 10th Dist. No. 18AP-753, 2019-Ohio-3789, ¶ 6, citing *State ex rel. Yellow Freight Sys., Inc.*

*v. Indus. Comm.*, 81 Ohio St.3d 56, 57 (1998), and *State ex rel. Varney v. Indus. Comm.* 143 Ohio St.3d 181, 2014-Ohio-5510, ¶ 16.

{¶ 12} The commission denied claimant's motion for loss-of-use compensation based on Dr. Mareska's medical reports, but the magistrate determined that Dr. Mareska's reports cannot constitute "some evidence" upon which the commission could base its order, because Dr. Mareska's reports do not comply with the holding in *Wallace*, 57 Ohio St.2d 55.

## A. The commission's objections

### 1. Dr. Mareska's reports do not comply with *Wallace*

{¶ 13} In its first objection, the commission argues that the magistrate erred by concluding that Dr. Mareska's reports are not compliant with the holding in *Wallace*.

{¶ 14} In *Wallace*, the Supreme Court of Ohio explained the proper use of medical opinions from non-examining physicians in claims for disability compensation:

> In light of the frequent use of medical opinions of non-examining physicians in processing claims for disability compensation, the Court of Appeals for Franklin County has developed an analogy that is employed to insure the reliability of those opinions. The court considers the physician's opinion tantamount to a response to a hypothetical question.
>
> * * * [I]t follows that the non-examining physician is required to expressly accept all the findings of the examining physicians, but not the opinion drawn therefrom. *If a non-examining physician fails to accept the findings of the [examining] doctors or assumes the role of the Industrial Commission, the medical opinion that is rendered does not constitute evidence to support a subsequent order of the commission.*

(Emphasis added and footnotes omitted.) *Id.* at 59. The court reasoned that "fundamental notions of fairness and evidentiary reliability support the analogy" with respect to the commission's use of non-examining physicians. *Id.* at 60. While a reviewing physician may disagree with the opinions of the examining physicians, the reviewing physician "cannot ignore the full extent of the factual foundation presented to him." *Id.*

{¶ 15} The claimant in *Wallace* sustained a work-related injury, and a workers' compensation claim was allowed for a " 'contusion and sprain, right wrist with ganglion formation dorsal aspect corpal area' " and a bone spur on the claimant's right shoulder. *Id.* at 55. When the claimant continued to suffer pain in his right upper arm after multiple

surgeries, he sought permanent total disability ("PTD") compensation. The record contained reports from three physicians, all of whom had examined the claimant and concluded that he was permanently and totally disabled. Nevertheless, Dr. Davies, a doctor in the commission's medical section who did not examine the claimant but only reviewed the claimant's file, concluded, " '* * * If only the *recognized conditions* are considered, the claimant is not permanently and totally disabled.' " (Emphasis sic.) *Id.* at 57. Based on that conclusion, the commission found the claimant was not permanently and totally disabled. This court subsequently denied the claimant's request for a writ of mandamus.

{¶ 16} On appeal to the Supreme Court of Ohio, the claimant argued that Dr. Davies's report was not "some evidence" upon which the commission could base its decision. The court agreed and held that, because Dr. Davies's opinion "in no way reflects that it accepts and is based upon all the factual findings of the physicians who examined" the claimant, "it cannot, by itself, be considered evidence upon which the commission could base its final order." *Id.* at 61; *accord State ex rel. Lampkins v. Dayton Malleable, Inc.*, 45 Ohio St.3d 14, 16 (1989). The court therefore reversed this court's judgment denying the claimant's complaint for a writ of mandamus.

{¶ 17} Here, the magistrate concluded that Dr. Mareska's reports did not comply with *Wallace* because Dr. Mareska did not accept the objective findings of the coroner, one of the examining physicians, as set out in the coroner's autopsy report and case summary. In fact, Dr. Mareska specifically stated that the coroner's findings regarding decedent's cerebral hemispheres were neither "congruent nor consistent with each other" and that he "could not rely on the described autopsy findings as being accurate or reliable." (Dec. 6, 2021 Stipulated Record, Mareska Report at 20994-R57.) As the magistrate noted, Dr. Mareska found in his addendum report "that the CT scan of the brain showed damage that was not reported in the autopsy report; the CT scan showed no evidence of conditions that were reported in the autopsy; the autopsy failed to show conditions that would be expected; the autopsy revealed conditions that were not supported by the clinical correlations or CT scan findings; and the autopsy showed normal conditions that were inconsistent with the clinical information or on the examination reported in the evidence-of-injury section of the autopsy." (Dec. 21, 2022 Mag.'s Decision at 70.) Based on Dr. Mareska's noncompliance

with *Wallace*, the magistrate concluded that his reports could not constitute "some evidence" on which the commission could base its order.

{¶ 18} The commission argues that the magistrate employed an "improperly strict" interpretation of *Wallace*, in a way that improperly restricts reviewing physicians' ability to offer opinions that differ from those of examining physicians when the reviewing physician believes that the examining physician's findings are inaccurate, unreliable, inconsistent, or incongruent with objective test results. (Jan. 31, 2023 Commission's Objs. at 2.) Yet a reviewing physician's role is not to question the accuracy or reliability of the examining physician's objective findings. Indeed, *Wallace* makes clear that a reviewing physician exceeds his role in the claim review process by offering a medical opinion that is based on anything other than the examining physicians' objective findings.

{¶ 19} In support of its first objection, the commission relies on *Teece*, 68 Ohio St.2d 165, in which the claimant, Teece, appealed this court's denial of her complaint for a writ of mandamus ordering the commission to find her permanently and totally disabled. Teece, who had been receiving permanent partial disability compensation for physical injuries to her right elbow and lower back and for anxiety and depression, filed applications with the commission for PTD compensation. She submitted with her applications a medical report from Dr. Robert R. Kessler, an orthopedist who had examined her relative to her physical injuries and had concluded that she was permanently and totally disabled as a result of those injuries. Teece also submitted a psychiatric report from Dr. Saim Giray, who had examined Teece and " 'reviewed for reference' certain medical reports," *id.* at 165, before concluding that Teece was "permanently and totally disabled as a result of the combined effect of her psychiatric condition and her physical injuries," *id.* at 166.

{¶ 20} At the commission's request, Dr. W.J. McCloud examined Teece with respect to her physical injuries, and psychiatrist Dr. Marc J. Horowitz examined Teece with respect to her psychological condition. Dr. McCloud found a lack of sufficient objective evidence of PTD as a result of Teece's physical injuries, but he did not mention Teece's psychological condition. Dr. Horowitz recited the history of Teece's physical injuries and concluded that she was entitled to " '15% permanent partial disability on the basis of Anxiety and Depression over and above any physical consequences of her injury.' " *Id.* at 166. Based on

the four medical reports and other evidence presented, the commission denied Teece's applications for PTD compensation.

{¶ 21} In denying Teece's request for a writ of mandamus, this court held that Dr. Kessler's report constituted evidence upon which the commission could have based its decision. We further held that the three other doctors' reports were insufficient to form the basis for the commission's decision, but they were sufficient for purposes of allowing the commission to evaluate Dr. Kessler's credibility and reliability.

{¶ 22} On appeal, the Supreme Court addressed whether each of the four medical reports constituted "some evidence" upon which the commission could have based its decision. The court first held that Dr. Kessler's report constituted evidence that Teece was permanently and totally disabled.[2] In contrast, it held that Dr. McCloud's report could not constitute evidence to support the commission's decision, because Dr. McCloud did not consider Teece's allowed psychiatric condition. It went on to hold that the psychiatrists' reports could not, "by themselves, be considered evidence upon which the commission could base its final orders" because the psychiatrists were non-examining physicians as to Teece's physical injuries and, in violation of *Wallace*, did not expressly adopt the factual findings of the physicians who examined Teece with respect to her physical injuries. *Id.* at 168.

{¶ 23} After concluding that the medical reports from Drs. McCloud, Horowitz, and Giray could not constitute some evidence in support of the commission's final order, the court nevertheless held that those reports remained "relevant and admissible" inasmuch as the factual findings in those reports—from physicians who had each examined Teece and had made their own objective findings—could be used to test the credibility and reliability of Dr. Kessler's conclusion that Teece was permanently and totally disabled. *Id.* at 168-69. The court noted there was a conflict between the objective, factual findings of Dr. Kessler and Dr. McCloud with respect to Teece's limitation of motion in her right elbow and forearm. *Id.* at 169. The court stated:

---

[2] The court held that Dr. Kessler's report complied with *State ex rel. Anderson v. Indus. Comm.*, 62 Ohio St.2d 166 (1980), in which the court established a combined effects evidentiary standard that required the commission to consider only medical reports that evaluated the claimant's total impairment resulting from the combined effect of all allowed conditions. The Supreme Court subsequently overruled *Anderson* and abandoned the combined effects standard. *See State ex rel. Burley v. Coil Packing, Inc.*, 31 Ohio St.3d 18 (1987).

> The holdings in [*Anderson* and *Wallace*] do not require the commission to accept the factual findings stated in a properly qualified medical report at face value and unquestioningly adopt them as those of the commission. To do so would be tantamount to allowing a physician to determine disability rather than the commission. Questions of credibility and the weight to be given evidence are clearly within the commission's discretionary powers of fact finding.

*Id.*

{¶ 24} The commission argues that the magistrate's decision here rejects the very latitude the Supreme Court approved in *Teece*. We disagree. Nothing in *Teece* suggests that the commission may rely on the report of a reviewing physician who does not accept the examining physicians' objective factual findings as required by *Wallace*. The court in *Teece* merely recognized that the commission is not required to accept or adopt the factual findings stated in a properly qualified medical report, because questions of credibility and the weight of the evidence fall squarely within the commission's discretionary fact finding authority. Additionally, the court acknowledged that factual finding by other doctors who examined the claimant—even if their opinions were not properly qualified—might influence the commission's exercise of that discretionary authority. As the trier of fact, the commission may determine that an examining doctor's factual findings are not credible, but it is not a reviewing physician's place to do so. And as the Supreme Court stated in *Wallace*, "If a non-examining physician * * * assumes the role of the Industrial Commission, [then] the medical opinion that is rendered does not constitute evidence to support a subsequent order of the commission." *Id.* at 59.

{¶ 25} The commission also attempts to reframe Dr. Mareska's reports, arguing that Dr. Mareska *did* accept the examining physicians' factual findings but that he properly explained why he believed those findings to be problematic and/or in conflict with each other. That argument, however, is blatantly inconsistent with the plain language of Dr. Mareska's initial report, which states, "I could not rely on the described autopsy findings [regarding decedent's cerebral hemispheres] as being accurate or reliable." (Stipulated Record; Mareska Report at 20994-R57.) In his follow-up report, Dr. Mareska reiterated, "In my opinion, the autopsy report has several instances of either not being consistent within itself, and not being consistent with the expected findings because of the clinical course." Thus, even though Dr. Mareska stated that he "accept[ed] * * * the findings of the

examining physician(s)," he did not accept those findings in practice. (Stipulated Record; Mareska Report at 20994 S89 & S95.) *See State ex rel. Hauck v. Hillandale Communities*, 10th Dist. No. 06AP-234, 2007-Ohio-842, ¶ 3 (reviewing physician's medical report did not constitute "some evidence" where, "[d]espite Dr. Scharf's claim that he had accepted the medical findings of the examining physician, he wholly ignored those findings[,]" in violation of *Wallace*).

{¶ 26} For these reasons, we conclude that the magistrate properly concluded that Dr. Mareska's reports did not comply with *Wallace* and could not constitute "some evidence" in support of the commission's order. We therefore overrule the commission's first objection.

### 2. Second objection—weighing of the evidence

{¶ 27} In its second objection, the commission argues that the magistrate erred by reweighing the evidence and by substituting his interpretation of Dr. Mareska's reports for that of the commission. We agree the commission is correct that this court may not reweigh the evidence or substitute its view of the credibility of the evidence for that of the commission. *See State ex rel. US Tubular Prods. v. Indus. Comm.*, 10th Dist. No. 18AP-795, 2020-Ohio-3427, ¶ 15, citing *State ex rel. Consolidation Coal Co. v. Indus. Comm.*, 78 Ohio St.3d 176, 177 (1997), citing *Burley*, 31 Ohio St.3d at 20. But the commission is incorrect insofar as it argues that the magistrate overstepped his bounds and reweighed the evidence here. The magistrate did not determine that other evidence—specifically the coroner's report—was *more credible* or *entitled to more weight* than Dr. Mareska's reports. He simply held that the commission was not entitled to rely on Dr. Mareska's reports because they did not comply with the holding in *Wallace*.

{¶ 28} Further, we reject the commission's suggestion that, under the magistrate's analysis, Dr. Mareska would face the impossible choice either to violate *Wallace* by not accepting the examining physician's supposedly inconsistent findings or to accept those findings and then proffer an opinion that those findings conflict with each other or with other findings. A reviewing physician need not make that choice, because the Supreme Court has already explained the limited scope of the reviewing physician's duty. A reviewing physician must base his medical opinion on the factual findings of the examining physicians.

{¶ 29} Because the magistrate did not reweigh the evidence or substitute his interpretation of Dr. Mareska's reports for that of the commission, we overrule the commission's second objection.

## B. Claimant's limited objections

{¶ 30} In her limited objections, claimant challenges only the magistrate's recommendation that this matter be returned to the commission for a redetermination of her motion for loss-of-use compensation. She argues that a limited writ/remand is unwarranted and improper, both because all the remaining evidence supports her claim for relief and because, more generally, the court lacks the authority to grant a limited writ. We disagree on both fronts.

{¶ 31} Claimant first asserts that, setting aside Dr. Mareska's reports (as this court has determined is required) and Dr. McGriff's report (which the commission rejected as improper for noncompliance with *Wallace*), the only remaining evidence upon which the commission could have based its order denying her motion for loss-of-use compensation was the report of Dr. Borillo, who stated, "even if [decedent] had survived the increased intracranial pressure from his head injury, and stabilization of his T4 fracture, to a reasonable degree of medical certainty he would have [had] a permanent and total loss of use of" his arms and legs. (Stipulated Record; Borillo Report at 20994-R40.) Dr. Borillo further concluded that decedent "suffered a permanent loss of vision, as his bilateral orbits (and internal structures) were shattered," and that decedent's "optic nerve and structures related to the visual apparatus were no doubt permanently injured." *Id.* Dr. Borillo offered no opinion whether decedent suffered a loss of hearing prior to his death.

{¶ 32} While noting potential questions about its persuasiveness, the commission determined that Dr. Borillo's report complied with *Wallace* and was competent evidence on which it could rely. Yet its order did not thereafter refer to or make any express determination regarding the persuasiveness of any of Dr. Borillo's conclusions. Instead, the commission relied exclusively on Dr. Mareska's reports, which the commission found "persuasive." (Mar. 18, 2021 Record of Proceedings at 2.) Claimant's first argument questions the effect of our determination that the commission could not rely on Dr. Mareska's reports as "some evidence" in support of its order.

{¶ 33} In *State ex rel. Gay v. Mihm*, 68 Ohio St.3d 315, 322 (1994), the Supreme Court "depart[ed] from past practice" and held that this court did not abuse its discretion when, instead of returning the case to the commission for further consideration and an amended order, it ordered the commission to enter a finding that the claimant was permanently and totally disabled. The Supreme Court reasoned that we had already determined, "no useful purpose would be served by 'remanding' the cause to the commission to justify a decision that [we] apparently believed could not possibly be justified." *Id.* It stated, "There comes a point in time when, in light of the overwhelming evidence, the courts must say, 'enough is enough.' That time has arrived, we have had enough, and so, too, did the court of appeals." *Id.* at 323. After noting that the 64-year-old claimant was medically incapable of returning to his work as a construction laborer, had a limited educational background, and had a proven inability to develop new skills necessary for other types of employment, the court asked, "What more did (or would) this particular claimant have to do to prove to the commission that he is permanently and totally disabled?" *Id.* at 323. *See also State ex rel. Franks v. Indus. Comm.*, 99 Ohio St.3d 35, 2003-Ohio-2456 (reversing this court's judgment denying relief in mandamus and proceeding directly to judgment for claimant based on the sole medical report in the administrative record that addressed the question of claimant's loss of half of his big toe); *Wyrick*, 2014-Ohio-541 (reversing this court's judgment denying a writ of mandamus and ordering that claimant was entitled to compensation for the scheduled loss of his left arm, where the only medical report that could constitute some evidence contradicted the commission's denial of compensation).

{¶ 34} The Supreme Court's determination in *Gay* that this court did not abuse its discretion when it ordered the commission to find that the claimant was permanently and totally disabled does not equate to a determination that this court was required to do so. The Supreme Court subsequently clarified that the holding in *Gay* "is not an occasion for *de novo* evidentiary review" and that the relief afforded in *Gay* "will be granted only in extraordinary circumstances," as it "was intended as a *narrow* exception" to the general practice of remanding deficient orders to the commission. (Emphasis sic.) *State ex rel. Pass v. C.S.T.*, 74 Ohio St.3d 373, 376 (1996). An order directly compelling the commission to award compensation—is appropriate only when the claimant "show[s] that a new

decision by the commission denying [compensation] would necessarily be an abuse of discretion." *State ex rel. Mobley v. Indus. Comm.*, 78 Ohio St.3d 579, 585 (1997), citing *Pass* at 376. In both *Pass* and *Mobley*, the Supreme Court granted limited writs, returning the matters to the commission with instructions to issue amended orders.

{¶ 35} This court has similarly returned cases to the commission after determining that the commission abused its discretion by denying claimants' motions for compensation. For example, in *Hauck*, 2007-Ohio-842, this court held that the medical report upon which the commission relied in denying the realtor's application for temporary total disability ("TTD") compensation did not comply with *Wallace* and could not constitute "some evidence" to support the commission's order. Although the only other medical report in the record, from the relator's treating physician, certified the relator as being temporarily and totally disabled, we nevertheless remanded the matter to the commission "to reconsider relator's entitlement to TTD compensation without consideration of" the report that did not comply with *Wallace*. *Id*. at ¶ 4.

{¶ 36} The determination that Dr. Mareska's reports are not "some evidence" on which the commission could base its order denying claimant's motion for scheduled-loss compensation does not necessarily entitle claimant to such compensation based on Dr. Borillo's report, because the commission is not required to accept Dr. Borillo's factual findings or conclusions. It is the commission's function to assign credibility and weigh the evidence before it. *State ex rel. Horsley v. Indus. Comm.*, 10th Dist. No. 87AP-215, 1988 Ohio App. LEXIS 1184, *9 (Mar. 29, 1988); *see also State ex rel. West v. Dept. of Ins.*, 10th Dist. No. 10AP-563, 2011-Ohio-3027; *State ex rel. Belivanakis v. Indus. Comm.*, 10th Dist. No. 02AP-822, 2003-Ohio-4174, ¶ 42. This court lacks the authority to determine the weight and credibility of the remaining evidence, including Dr. Borillo's report. *See State ex rel. Bowman v . Indus. Comm.*, ____ Ohio St.3d ____, 2022-Ohio-233, ¶ 16. Requiring the commission to accept the factual findings contained in a medical report and to adopt the conclusions therein as the commission's own "would be tantamount to allowing a physician to determine disability rather than the commission." *Id.*, citing *Teece*, 68 Ohio St.2d at 169.

{¶ 37} Finally, we reject claimant's more general argument that, in mandamus actions stemming from decisions of the commission, appellate courts lack the authority to

issue limited writs. Both this court and the Supreme Court have routinely issued limited writs for decades. *See, e.g., Mobley*, 78 Ohio St.3d at 586; *Pass*, 74 Ohio St.3d at 376; *Hauck*, 2007-Ohio-842; *State ex rel. Mullens v. The Williams Mfg. Co.*, 10th Dist. No. 86AP-04, 1986 Ohio App. LEXIS 9048 (Nov. 6, 1986). Claimant's stated fear that the continued use of limited writs will result in a perpetual cycle of mandamus actions and remands to the commission is nothing but speculative catastrophizing that the longstanding use of limited writs in similar contexts easily dispels.

{¶ 38} Claimant requested a writ of mandamus ordering the commission to take two actions: (1) to vacate its April 14, 2021 order denying her motion for loss-of-use compensation, and (2) to grant that motion. We agree with the magistrate's conclusion that claimant has demonstrated a clear legal right to a writ compelling the commission to take the first requested action, but not the second. The commission abused its discretion in entering its April 14, 2021 order by improperly relying on Dr. Mareska's reports, which could not constitute "some evidence" because of Dr. Mareska's noncompliance with *Wallace*. That, however, is the extent of the commission's action that calls for correction now. We cannot determine whether claimant had a clear legal right to loss-of-use compensation without stepping outside the limited bounds of our authority and improperly assessing the weight and credibility of the remaining evidence in support of claimant's motion. The fact that claimant's ultimate entitlement to compensation must be considered anew by the commission does not preclude this court from granting her the relief to which she is entitled—an order compelling the commission to vacate its April 14, 2021 order denying her motion for loss-of-use compensation and to reconsider the merits of that motion.

{¶ 39} For these reasons, we overrule claimant's limited objections to the magistrate's decision.

## IV. CONCLUSION

{¶ 40} Following an independent review pursuant to Civ.R. 53, we find the magistrate has properly determined the pertinent facts and applied the appropriate law. Therefore, we overrule both the commission's and claimant's objections to the magistrate's decision, and we adopt the magistrate's decision, including the findings of fact and conclusions of law contained therein, as our own. In accordance with the magistrate's

decision, we grant a limited writ of mandamus ordering the commission to vacate its April 14, 2021 order and issue an order determining, consistent with the law and this court's decisions, whether claimant has established decedent's loss of use of both arms and legs, loss of vision in both eyes, and/or loss of hearing in both ears, pursuant to R.C. 4123.57(B), and to enter an order granting or denying compensation accordingly.

*Objections overruled;*
*limited writ granted.*

BEATTY BLUNT, P.J., and MENTEL, J., concur.

———————————

**APPENDIX**

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

| | | |
|---|---|---|
| State ex rel. Patricia A. Heilman, | : | |
| Relator, | : | |
| v. | : | No. 21AP-353 |
| Industrial Commission of Ohio et al., | : | (REGULAR CALENDAR) |
| Respondents. | : | |

M A G I S T R A T E ' S   D E C I S I O N

Rendered on December 21, 2022

*Plevin & Gallucci Co., L.P.A., Frank Gallucci, III, Bradley Elzeer, II,* and *Flowers & Grube, Paul W. Flowers, Louis E. Grube,* and *Melissa A. Ghrist,* for relator.

*Dave Yost*, Attorney General, and *Natalie J. Tackett,* for respondent Industrial Commission of Ohio.

IN MANDAMUS

{¶ 41} Relator, Patricia A. Heilman ("claimant"), has filed this original action requesting this court issue a writ of mandamus ordering respondent, Industrial Commission of Ohio ("commission"), to vacate its order that denied payment for loss of use of both arms and legs, loss of vision in both eyes, and loss of hearing in both ears, pursuant to R.C. 4123.57(B), with regard to her deceased husband, Arthur J. Heilman ("decedent"), and to enter an order granting such compensation.

Findings of Fact:

{¶ 42} 1. The decedent was injured on April 4, 2019, in the course of and arising from his employment with respondent, Riverside Maine Industries, Inc. ("employer"), when he

was struck in the head by a piece of metal from a machine that suffered a failure. Decedent died on April 6, 2019, as a result of his work-related injuries. The employer certified claimant's claim, and her request for death benefits was paid on October 15, 2019.

{¶ 43} 2. The April 4, 2019, emergency room reports and diagnostic testing showed that decedent had multiple hematomas to the bilateral orbits, nonreactive pupils, left orbit fracture, temporal bone fracture, and closed fracture of the clivus of the occipital bone.

{¶ 44} 3. The April 4, 2019, ophthalmology exam by Jason Ofori, M.D., showed decedent had periorbital hematoma and ecchymosis to both eyelids, clear corneas, deep and clear anterior chambers, clear lenses, minimally reacting pupils, bright red vitreous with no floaters or vitreous hemorrhage, intact globes, and no clinical evidence of acute optic nerve injury, but he was unable to assess vision, visual fields, extra ocular movements, and dilation.

{¶ 45} 4. The coroner's case summary, completed by coroner Diane Scala-Barnett, M.D. ("coroner"), indicated the following, in pertinent part: (1) a deep longitudinal tear of the left cerebral hemisphere with large intra parenchymal hematoma; (2) hematoma breaks into the lateral ventricle; (3) shearing white matter hemorrhages, left frontal lobe near laceration; (4) subarachnoid hemorrhage; (5) contracoup contusion hemorrhages, right lateral surface of the brain; (6) subfalcine herniation-mass effect, left to right shift of the midline; and (7) subgaleal hemorrhage, entire scalp.

{¶ 46} 5. In addition to the findings in the coroner's case summary, the coroner's report of autopsy indicated the following, in pertinent part: (1) the corneas are clear; (2) there is a bilateral conjunctival hemorrhage; (3) both eyelids are heavily bruised; (4) there are fractures of the right frontal bone extending through the orbital plate into the pituitary fossa; (5) there is a left occipital fracture; (6) there are no skeletal fractures or deformities; (7) the lower extremities are without fractures or deformities; and (8) there are no lesions on the back and no gross deformities of the spine.

{¶ 47} 6. On March 2, 2020, Donato Borrillo, M.D., completed an independent medical review ("IMR"), in which he found the following: (1) decedent suffered a permanent loss of use of his four extremities and permanent loss of vision; (2) even if decedent had survived the increased intracranial pressure from his head injury and stabilization of his T4 fracture, he would have a permanent and total loss of use of the four

extremities; (3) decedent suffered a permanent loss of vision, as his bilateral orbits and internal structures were shattered, and the optic nerve and structures related to the visual apparatus were no doubt permanently injured; (4) decedent suffered a spinal injury at T4 and had no purposeful movement of his four limbs while hospitalized; and (5) despite relief of his intracranial pressure, he still had permanent spinal and central nervous system injury.

{¶ 48} 7. On March 31, 2020, claimant filed a C-86 motion for payment of loss-of-use compensation for the total loss of use of both arms and legs, loss of vision in both eyes, and loss of hearing in both ears, relying upon Dr. Borrillo's IMR report.

{¶ 49} 8. On April 26, 2020, John C. Mareska, M.D., at the request of the Bureau of Workers' Compensation ("BWC"), completed a review of the medical file. In a report of the same date, Dr. Mareska found the following: (1) decedent suffered no loss of use of his arms and legs due to an injury of the arms and legs themselves, as the physical exam, radiological studies, and autopsy reports document no injuries to the arms or legs themselves; (2) there was no loss of use to both arms and legs due to injury of the spinal cord, as physical exam, radiological studies, and autopsy reports show no abnormalities of the spinal cord; (3) there was insufficient evidence to support the loss of use to both arms and legs due to loss of brain function secondary to the injury in question; (a) physical examinations reveal motor movements despite sedation and narcotics; (b) the radiographic studies reveal abnormalities of the cranium and intracranial structures without valid clinical correlation of the loss of use of the arms and legs; (c) the autopsy findings of the cerebral hemisphere seem incongruent because the findings of the left hemisphere being squeezed and collapsed from the outside by a subdural, squeezed and expanded from the inside by an intraventricular hemorrhage, and exhibiting lacerations and hematomas in the parenchyma are not congruent or consistent with each other; (4) under the influence of narcotics and sedation, the reduction of spontaneous movements or responses to pain stimuli is not a fully valid clinical assessment of the degree of organic/structural incapacitation regarding the loss of arms and legs; (5) radiographic and autopsy reports are not predictive of clinical performance; clinical correlation is necessary and the usual standard; given the absence of valid and reliable clinical evaluations (because examinations were done with sedatives and narcotics being used) of arm and leg motor movements not

seen, plus the repeated presence of observed and documented spontaneous movements, the evidence is insufficient to support the condition of loss of use of both arms and both legs; (6) there is insufficient evidence to support loss of vision; (7) there is no documentation that vision was ever checked; pupillary response is not a check of vision capacity; (8) radiographic studies document that the globes are intact and not shattered; there is intrusion of a bony fragment into the optic canal but no reported contact or impingement or injury to the optic nerve; and there is no abnormality of the calcarine visual cortex where the vision is "displayed"; (9) broken, shattered, or fragmented bones, fragments near ocular muscles or nerves, fixed or reactive pupils, and bruised and swollen eyelids do not result in a loss of vision; (10) subarachnoid and subdural hemorrhages over the surfaces of the brain do not reliably result in loss of vision; (11) given the absence of clinical findings/documentation of loss of vision, radiographic findings of intact globes, no mention of affliction of the optic nerve, plus no autopsy findings reporting of abnormalities of globes or nerves, the evidence is insufficient to support loss of vision, total loss of vision, or permanent loss of vision by either: (a) the brain's inability to process visual stimuli; (b) direct trauma to the eye; or (c) direct trauma to the optic nerves; (12) neither Dr. Borrillo's report nor any other medical evidence provides evidence to support loss of hearing; (13) by physical examination, there was no evidence of an external ear injury; there is no evidence of hemotympanum that would have reflected a middle ear and possibly auditory nerve injury; there is no clinical testing done of auditory function; there is no clinical evidence of hearing loss; radiographs show no fracture of the petrous bone that encased the auditory nerve and no evidence of injury to the auditory nerve; the autopsy does not report any abnormality of the ear or of the auditory nerve, and the brainstem was normal; (14) when one is unconscious, whether induced by a blow to the head, sedative medications, or narcotics, one is unaware of one's self and also unaware of the environment; one does not have awareness of his arms or legs or awareness of any desire to do anything with them; (15) given that decedent's exams were performed while on sedation, paralytics, and narcotics during his brief period of post-injury survival, there was not a valid, accurate, or reliable means of prognosticating inability use both arms, both legs, hearing loss, and vision loss; (16) spontaneous motor movements are repeatedly documented in the file by different examiners; and (17) Dr. Mareska accepts the findings but not necessarily the opinions of the examining physicians.

{¶ 50} 9. Patrick Kelley McGriff, D.O., at the request of the employer, completed a review of the medical file, including Dr. Borrillo's March 2, 2020, and Dr. Mareska's April 26, 2020, reports. In an August 19, 2020, report, Dr. McGriff found the following: (1) accepting Dr. Mareska's opinion regarding the loss of use of both arms and legs, then the cause of decedent's inability to purposely move must be a direct result of loss of brain function, as at no time during decedent's hospital admission does he demonstrate the ability to purposefully move his arms and legs, and he is progressively unable to withdraw from noxious stimuli; and (2) with regard to Dr. Mareska's opinion regarding the loss of vision, he disagrees with Dr. Mareska's conclusion in that the autopsy demonstrated evidence of injury specifically to the right and left frontal bones and orbital/occipital structures; at no time, irrespective of decedent's sedation level, do records indicate that decedent purposely responded to any auditory commands; and (3) he concurs with Dr. Borrillo's opinions and believes the claim should be additionally allowed for the loss of use of arms and legs, loss of vision, and loss of hearing.

{¶ 51} 10. On August 26, 2020, a district hearing officer ("DHO") held a hearing on claimant's motion. In an order mailed August 28, 2020, the DHO found the following: (1) decedent's C-86 is denied; (2) Dr. Mareska opines there is insufficient evidence to establish the loss of use of both arms and legs as a result of loss of brain function; (2) Dr. Mareska opines there is no loss of use of arms and legs due to injury to the spinal cord; (3) Dr. McGriff opines in his August 19, 2020, report that decedent suffered loss of use of both arms and legs as a result of loss of brain function; however, the court held in *State ex rel. Smith v. Indus. Comm.*, 138 Ohio St.3d 312, 2014-Ohio-513, that the loss of use does not include loss of use as a result of a loss of brainstem functioning; (4) with respect to the loss of bilateral vision, Dr. Mareska opines that there is no sufficient evidence to support a conclusion that decedent suffered a loss of vision by either the brain's inability to process visual stimuli, direct trauma to the eyes, or trauma to the optic nerve; (5) Dr. Mareska opines that there is no evidence by way of physical examination, radiographic studies, or autopsy, of an injury or dysfunction to the ear, auditory nerve, or brain that would result in a loss of hearing; and (6) finding most persuasive and relying on the report of Dr. Mareska, decedent has not met his burden to establish the loss of use of his bilateral arms and legs, bilateral vision, or bilateral hearing as a result of the industrial injury. Claimant appealed.

{¶ 52} 11. On October 21, 2020, a staff hearing officer ("SHO") held a hearing on claimant's appeal. In an order mailed November 24, 2020, the SHO found the following: (1) the DHO's order is vacated; (2) decedent is denied a scheduled loss of use of both legs and both arms, loss of vision in both eyes, and loss of use of hearing in both ears; (3) Dr. Mareska's April 26, 2020, report is not some evidence on which the commission can rely, pursuant to *State ex rel. Wallace v. Indus. Comm.*, 57 Ohio St.2d 55 (1979), because Dr. Mareska indicated that the autopsy findings were not congruent nor consistent with each other and were not accurate or reliable; (4) Dr. Borrillo's report complied with *Wallace*, in that he indicated he expressly accepted the findings and reports of the examining physicians; (5) Dr. McGriff did not expressly accept the findings of the examining physician in the autopsy report; thus, Dr. McGriff's report is not some evidence the commission could rely upon pursuant to *Wallace*; (6) *Smith* does not extend beyond vision and hearing and does not support the proposition that the brain cannot cause the loss of use of otherwise functioning arms and legs; (7) the emergency room record notes no deformity to the spine, no edema or deformity to the decedent's extremities, and no spontaneous movement of the extremities but normal reflexes; (8) the April 4, 2019, note from Aaron Moore, M.D., documented that decedent withdrew from pain, had no musculoskeletal deformity, and prior to intubation moved his left arm without purpose; (9) the post-operative note from Matthew Syverson, D.O., documented that decedent moved part of his body but did not remove noxious stimulus, had no bilateral hand grasp, had no bilateral wiggle of fingers or toes, had negative bilateral Babinski's, and no response to sternal rub; (10) Dr. Orfori's April 4, 2019, note indicated concerns for the integrity of the decedent's optic nerve due to orbital wall and posterior orbits fractures; (11) an April 4, 2019, head CT scan documented the globes were intact, and a CT scan of the facial bones from the same date demonstrated the fractures documented by Dr. Orfori; (12) the April 4, 2019, neurosurgery consultation note from Mohammed Jallad, APRN-CNP, documented there was a report of some type of movement in the trauma bay, the decedent's eyes were swollen shut, decedent withdrew from pain, and he had a closed fracture at T4; (13) Dr. Jallad's April 5, 2019, post-surgical neurosurgery progress note documented the decedent had no response to painful stimuli; (14) the April 5, 2019, palliative care inpatient consult from Rashmi Puri, M.D., documented the decedent had extensive orbital fractures extending to the optic canal, had fractures of the posterior orbits, had a closed fracture at

T4, had no response to painful stimuli, and did not follow commands; (15) the April 4, 2019, CT scans documented no acute fractures of the decedent's cervical and lumbar spines and pelvis, an acute fracture involving the T4 superior endplate anteriorly with no significant height loss, and a focal paraspinal hematoma next to the T4 fracture; (16) the April 6, 2019, discharge summary listed left orbit fracture and T4 fracture, and decedent had a poor neurological examination off sedation with no response to painful stimuli; (17) the autopsy report documented findings with regard to the extremities and spine; (18) Dr. Borrillo's March 2, 2020, report provided an opinion regarding the loss of use of decedent's four extremities and loss of vision; however, Dr. Borrillo did not provide an opinion whether decedent sustained a loss of bilateral hearing; (19) Dr. Borrillo's March 2, 2020, report is defective and unreliable because his opinions are based on findings not supported by the medical record; (20) although Dr. Borrillo opined that decedent had a permanent spinal injury, the April 4, 2019, thoracic CT scan documented an acute fracture with no significant height loss, and the autopsy report documented decedent's spinal cord was intact; (21) although Dr. Borrillo indicated that decedent's bilateral orbits and internal structures were shattered, Dr. Orfori's April 4, 2019, report assessed decedent with bilateral globe contusion with multiple comminuted bilateral orbital wall fractures of both eyes, intact globes bilaterally, and no clinical evidence of acute optic nerve injury, while the April 4, 2019, head CT scan documented the globes were intact; (22) there was insufficient evidence of an external injury to one or both of decedent's ears, and there was insufficient evidence that decedent's hearing was tested; thus, there was insufficient persuasive evidence that decedent sustained a loss of his bilateral hearing; (23) the weight of the evidence does not support the decedent sustained a loss of use of both legs, both arms, vision in both eyes, or hearing in both ears; and (24) loss of use compensation is denied. Claimant appealed.

{¶ 53} 12. On December 15, 2020, the commission refused the appeal. On January 25, 2021, claimant requested that the commission reconsider its order.

{¶ 54} 13. On March 8, 2021, Dr. Mareska issued a lengthy addendum to his report, answering several questions presented by the BWC regarding the claim. With regard to his opinion in his April 26, 2020, report, that the findings in the autopsy were inconsistent and/or incongruent, Dr. Mareska opined the following: (1) the CT scan of the brain showed an extensive subdural hematoma over the left cerebral hemisphere, but the autopsy does

not report any flattening of the gyri or effacement of the cortical surface structures; it is rather atypical for the autopsy to not reveal cortical effacement given the known clinical/surgical information; (2) the CT scan showed no evidence of hydrocephalus, but the autopsy showed a large, quite enlarged, left ventricle; this is an unexplained and unusual discrepancy when compared to the clinical, neurosurgical, and CT report; how and when did this quite large ventricle arise, given the patient died within 48 hours of his neurosurgical decompressive procedure?; (3) one would expect thinning of the cortex, which is not found on autopsy; it was unusual that the bilateral cortical and subcortical tissue thicknesses were normal and not asymmetrical; (4) the autopsy reveals the left hemisphere to have a longitudinal laceration and large intraparenchymal hemorrhage, but there are no clinical correlations or CT scan findings to support this autopsy finding, and the coronal slices of the cerebral cortex are not reported as showing any signs of a laceration or contusions; and (5) coronal slices of the bilateral hemispheres reveal normal width and thickness with no evidence of a left hemisphere laceration, left hemisphere intraparenchymal hemorrhage, enlarged left ventricle, or rupture of the left hemisphere intraparenchymal hemorrhage into the ventricle, which is not consistent with the clinical information or on the examination reported in the evidence of injury section of the autopsy.

{¶ 55} With regard to the conclusions in Dr. Borrillo's March 2, 2020, report or Dr. McGriff's August 19, 2020, report, Dr. Mareska opined the following: (1) he does not agree with their conclusions regarding decedent's having loss of use; (2) with regard to Dr. McGriff's loss-of-vision conclusions, Dr. McGriff contends that the injury to the frontal, orbital, and occipital bones is causative of permanent loss of vision; however, these bones and their injuries, by and in and of themselves, have no impact on the capacity for vision, none of the fractures damages the adjacent vision/neural tissue, and the May 4, 2019, ophthalmological evaluation was unable to document vision loss or impairment; (3) it is not well reasoned by Dr. McGriff that fractured bones alone are responsible for total permanent loss of vision; (4) the subjective and/or objective evidence and findings in the presented file are insufficient to support the conclusion that the injured worker suffered total and permanent loss of vision; (5) with regard to loss of use of limbs, he does not agree with Dr. Borrillo's conclusion addressing loss of use of all four extremities, and the same conclusion applies to Dr. McGriff's conclusions, in that (a) Dr. McGriff's thoughts are vexing and not well reasoned; (b) failure of spontaneous or purposeful movements of

decedent's extremities while in the hospital in an unconscious and sedated state is no indication of irreversibility of lack of movements or permanent loss of use of the extremity; (c) Dr. McGriff has two etiologies of loss of use of the four extremities: loss of brain function, and T4 vertebral fracture; (6) with regard to loss of use of hearing, Dr. Borrillo did not take a stand, discuss, or offer an opinion regarding loss of hearing, yet in Dr. McGriff's August 19, 2020, report, Dr. McGriff states he concurs with Dr. Borrillo's decision; (7) contrary to Dr. McGriff's opinion, Dr. Mareska believed that decedent's being sedated is an important factor to consider because an unconscious state can subdue responses to a variety of stimuli; he found no evidence of a physical neurological examination focused on testing hearing; he found no electrodiagnostic testing such as brainstem auditory evoked response potentials performed to assess hearing; only one clinical visit on April 5, 2019, documents decedent is not following commands, and this is elicited while decedent is on an ongoing IV of Propofol and Fentanyl, respectively a powerful sedative and powerful pain killer; decedent was never tested for hearing loss in a valid clinical manner; testing while decedent is sedated did not give a reliable result of decedent's baseline capabilities; and (8) the history, physical examination findings, laboratory studies of CT scans, hospital course, and subjective and/or objective evidence is insufficient to support the conclusion that there is a total and permanent hearing loss.

{¶ 56} With regard to Dr. Borrillo's conclusion that decedent had bilateral shattered orbits, Dr. Mareska opined the following: (1) Dr. Mareska did not find the term "shattered" applied to the orbits by the interpreting radiologist or any of the clinicians; (2) the ocular globe and the optic nerve were not found or described as being "shattered," contrary to Dr. Borrillo's finding; (3) Dr. Borrillo's finding that the visual apparatus was permanently injured is without evidence; (4) if decedent had survived the injuries, the evidence is insufficient to support the position that shattering of the bilateral orbital bones themselves would have caused permanent loss of vision; (5) the orbits serve no function regarding vision itself, and breaking the bones does not affect vision per se; (6) the CT scan shows the globes and optic nerves to be intact and not impacted by the bony fragments; (7) the ophthalmologist could not assess vision because of decedent's condition; (8) there was no subjective history of loss of vision due to the injury and no clinical physical examination finding impairment or loss of vision; (9) the absence of evidence of vision loss is not evidence of absent vision; and (10) the subjective and/or objective evidence in the file is

insufficient to support the contention that the injured worker had loss of use of vision of any kind at any time or that it was permanent in nature.

{¶ 57} With regard to whether decedent would have sustained a permanent loss of purposeful movement of his extremities due to the T4 fracture indicated in Dr. Borrillo's March 2, 2020, report, Dr. Mareska opined the following: (1) although Dr. Borrillo found that decedent suffered a permanent spinal injury and had no purposeful movements while hospitalized, Dr. Borrillo does not connect the two or state a causal relationship, and even if there was a T4 injury, the upper extremities would be spared and not affected in any way; (2) there is no record that decedent had subjective complaints of inability to move his arms and legs; (3) a T4 injury that would be responsible for a permanent loss of use of the legs would also prevent the spontaneous, non-purposeful movements that were observed and documented; (4) no physical examination for muscle tone or movements was done while decedent was not sedated or unconscious, and any lack of movement during the hospitalization cannot be construed as a total and permanent loss of function of the extremities; (5) there is no report of any bone, pressure, swelling, or bruising pressing upon or impacting the spinal cord at the T4 level, and there is no evidence of a spinal cord injury to any degree; (6) decedent cannot have sustained a permanent loss of purposeful movement of his four extremities due to the relatively minor bone T4 fracture at the anterior portion of the end plate that is away from the spinal cord; and (7) Dr. Borrillo never states the T4 fracture caused a spinal injury.

{¶ 58} 14. On March 11, 2021, the commission granted claimant's request for reconsideration. On April 14, 2021, the commission issued an order, in which it found the following: (1) claimant's request for a scheduled loss award for total loss of use of both arms and legs, loss of vision in both eyes, and loss of hearing in both ears is denied; (2) Dr. McGriff's August 19, 2020, report is not reliable because, as a non-examining physician, he did not expressly accept the findings of the examining physicians on file; (3) the March 2, 2020, report of Dr. Borrillo may be considered; (4) the April 26, 2020, and March 8, 2021, reports of Dr. Mareska are reliable medical evidence, because a reviewing physician is not required to blindly accept medical findings on file that the physician identifies as inconsistent if the physician provides an explanation for the opinion; and (5) Dr. Mareska's reports support a finding that decedent did not sustain the loss of use of both

arms and legs, the loss of vision in both eyes, or the loss of hearing in both ears as a result of the injury in the claim.

{¶ 59} 15. On July 19, 2021, claimant filed a complaint for writ of mandamus requesting that this court order the commission to vacate its order that denied payment for loss of use of both arms and legs, loss of vision in both eyes, and loss of hearing in both ears, pursuant to R.C. 4123.57(B), and to enter an order granting such compensation.

Conclusions of Law and Discussion:

{¶ 60} The magistrate recommends that this court grant a limited writ of mandamus.

{¶ 61} In order for this court to issue a writ of mandamus, a relator must ordinarily show a clear legal right to the relief sought, a clear legal duty on the part of the respondent to provide such relief, and the lack of an adequate remedy in the ordinary course of law. *State ex rel. Pressley v. Indus. Comm.*, 11 Ohio St.2d 141 (1967).

{¶ 62} A clear legal right to a writ of mandamus exists where the relator shows that the commission abused its discretion by entering an order that is not supported by any evidence in the record. *State ex rel. Elliott v. Indus. Comm.*, 26 Ohio St.3d 76 (1986). On the other hand, where the record contains some evidence to support the commission's findings, there has been no abuse of discretion and mandamus is not appropriate. *State ex rel. Lewis v. Diamond Foundry Co.*, 29 Ohio St.3d 56 (1987). Furthermore, questions of credibility and the weight to be given evidence are clearly within the discretion of the commission as fact finder. *State ex rel. Teece v. Indus. Comm.*, 68 Ohio St.2d 165 (1981).

{¶ 63} R.C. 4123.57(B) authorizes scheduled compensation to a claimant for the total loss of a body part, such as the total loss of an arm, leg, ear, or eye. "Loss" within the meaning of the statute includes not only amputation, but also the loss of use of the affected body part. *State ex rel. Wyrick v. Indus. Comm.*, 138 Ohio St.3d 465, 2014-Ohio-541, ¶ 10, citing *State ex rel. Moorehead v. Indus. Comm.*, 112 Ohio St.3d 27, 2006-Ohio-6364, ¶ 13. An injured worker claiming loss of use under R.C. 4123.57(B) bears the burden of showing that the loss of use is complete and permanent. *State ex rel. Carter v. Indus. Comm.*, 10th Dist. No. 09AP-30, 2009-Ohio-5547.

{¶ 64} "It is undisputed that a physician conducting a file review must accept all the allowed conditions as well as the objective findings of the examining physician." *State ex rel. Caldwell v. New Boston Coke Corp.*, 10th Dist. No. 10AP-1068, 2011-Ohio-6053, ¶ 4, citing *State ex rel. Lampkins v. Dayton Malleable, Inc.*, 45 Ohio St.3d 14 (1989). If a doctor who conducts a file review accepts the findings of the reviewing physicians, the reviewing doctor's report can constitute "some evidence." *State ex rel. Boyer v. Indus. Comm.*, 10th Dist. No. 05AP-107, 2005-Ohio-6100, ¶ 21, citing *Wallace. See also Lampkins* at ¶ 16 (relaxing the express acceptance requirement in *Wallace* and permitting reliance on a non-examining physician's report where the report impliedly accepted the findings of the examining physicians). However, under the so-called *Wallace* rule, the non-examining physician is not required to accept the opinions drawn from the examining physician's findings. *State ex rel. Consolidation Coal Co. v. Indus. Comm.*, 78 Ohio St.3d 176, 179 (1997). As the court explained in *Wallace*, when a non-examining physician renders an opinion, it is considered to be a response to a hypothetical question. *Id.* at 59 (finding that "[a]pplying the analogy to a hypothetical question, it follows that the non-examining physician is required to expressly accept all the findings of the examining physicians, but not the opinion drawn therefrom").

{¶ 65} In the present case, claimant's arguments can be generally grouped into the following five contentions. First, with regard to claimant's argument that Dr. Mareska's report was unreliable, claimant argues the following: (1) Dr. Mareska's report failed to comply with *Wallace*, because he rejected and ignored objective findings of examining physicians within the medical record; (2) although Dr. Mareska initially asserted he would accept the allowed conditions in the claim, as well as the findings of the examining physicians, he rejected the objective autopsy findings–not merely the opinions–for numerous reasons; (3) as to decedent's significant brain injuries, Dr. Mareska dismissed the findings of the examining physician, stating that the autopsy findings involving the cerebral hemisphere seemed incongruent; (4) Dr. Mareska relied on the repeated presence of observed and documented spontaneous movements and discounted the clinical evaluations of arm and leg motor movements because examinations were done with sedatives and narcotics being used; (5) Dr. Mareska ignored his own observations that sedation had been stopped for a significant period, and he rejected the examining

physician's clinical finding that such movements were minimal and not purposeful; (6) Dr. Mareska failed to acknowledge the findings of the emergency-room staff, who noted that decedent arrived without neuromuscular blockade, he was generally capable of withdrawing from pain, and movements of his left upper extremity were not purposeful; and (7) in his addendum, while Dr. Mareska purported to accept the allowed condition in his claim, as well as the findings of the examining physicians, he provided detailed explanations for why he disagreed with the objective findings of the coroner, including: (a) Dr. Mareska claimed there was no radiographic report of the cord at the T4 being damaged despite the fact that the radiological report documented a paraspinal hematoma adjacent to the T4 fracture; and (b) Dr. Mareska rejected the importance of the clinical observation of a lack of purposeful movement due to the ongoing combination of Propofol and Fentanyl, despite having earlier observed that Propofol was stopped for several hours.

{¶ 66} Second, claimant argues the commission wrongly rejected Dr. McGriff's report, asserting as follows: (1) the commission misapplied *Wallace* and its progeny by rejecting Dr. McGriff's report; (2) it is false that Dr. McGriff did not expressly accept the findings of the examining physicians in the file and, in fact, he reviewed the report of autopsy and explicitly accepted the findings as correct; and (3) Dr. McGriff specifically stated his report was based upon the history provided by the other examiners, findings on the examination, and the information contained in the medical records, and he assumed that the material provided is correct.

{¶ 67} Third, claimant argues that the commission should have rejected Dr. Mareska's report because it was internally inconsistent, in that Dr. Mareska claimed to accept the clinical note that Propofol sedation had been withdrawn for a number of hours, yet he ignored this fact to erroneously conclude to the contrary that decedent's lack of movements was solely the result of unceasing sedation.

{¶ 68} Fourth, claimant argues that the commission abused its discretion by relying upon Dr. Mareska's report because Dr. Mareska inferred from decedent's spontaneous, minimal, and non-purposeful movements that he had not lost the use of his extremities for all practical intents and purposes, contrary to the rule in *State ex rel. Alcoa Bldg. Prods. v. Indus. Comm.*, 102 Ohio St.3d 341, 2004-Ohio-3166, which found that there can still be a loss of use for all practical purposes even if the limb retained some residual utility, and

residual hypersensitivity, pain, and tenderness of a limb was enough to establish loss of use. In this case, claimant asserts, the residual capacity of decedent's limbs to move spontaneously is insufficient under *Alcoa* to establish that there remains functional use.

{¶ 69} Fifth, claimant argues that the commission abused its discretion when it relied on Dr. Mareska's report because he contrived a consciousness test and injected a prohibited duration-of-survival requirement contrary to *State ex rel. Moorehead*, 112 Ohio St.3d 27, 2006-Ohio-6364, which held that R.C. 4123.57(B) does not specify a required length of time of survival after a loss-of-use injury. Claimant contends that Dr. Mareska violated *Moorehead* when he found that there could be no loss of use because decedent was unconscious due to sedation and narcotics and was unaware of his arms and legs or a desire to do anything with them. Claimant asserts that loss of use is the only requirement, and decedent's awareness of his loss of use is irrelevant. Furthermore, claimant argues, Dr. Mareska engrafted an unlawful duration-of-survival requirement onto R.C. 4123.57(B) when he found that the clinical assessment of decedent's brain injuries occurred during the brief period of survival, and those exams were unreliable to demonstrate loss of use due to sedation, paralytics, and narcotics. Claimant asserts that decedent was not required to live long enough for any testing to take place.

{¶ 70} With regard to claimant's first argument, the magistrate agrees with claimant that Dr. Mareska's reports conflict with the holding in *Wallace*. Specifically, Dr. Mareska did not accept the objective findings of one of the examining physicians, the coroner, in the autopsy report and case summary. In his April 26, 2020, report, Dr. Mareska found the autopsy findings as to the cerebral hemisphere seemed inconsistent and/or incongruent both internally and externally. In his March 8, 2021, addendum report, Dr. Mareska found that the CT scan of the brain showed damage that was not reported in the autopsy report; the CT scan showed no evidence of conditions that were reported in the autopsy; the autopsy failed to show conditions that would be expected; the autopsy revealed conditions that were not supported by the clinical correlations or CT scan findings; and the autopsy showed normal conditions that were inconsistent with the clinical information or on the examination reported in the evidence-of-injury section of the autopsy. Although the commission attempts to characterize Dr. Mareska's disagreement with these findings in the autopsy report as a disagreement of opinion in an attempt to fit within the holding of

*Wallace*, Dr. Mareska is clearly disagreeing with the coroner's findings and not the opinions drawn therefrom. The coroner conducted her examination and reported what she found upon examination. The physical examination revealed a large left ventricle, normal cortex, a longitudinal laceration and large intraparenchymal hemorrhage, and normal width and thickness of the bilateral hemispheres. Objective findings include, among other things, x-rays, bone scans, objective abnormalities of the body based upon physical examination, measurements of body parts, physical tests, mechanical tests, and clinical signs that can be confirmed or corroborated. *See, e.g., State ex rel. Kish v. Kroger Co.*, 10th Dist. No. 10AP-882, 2011-Ohio-5766. Here, the coroner's observation of a large left ventricle, normal cortex, longitudinal laceration and large intraparenchymal hemorrhage, and normal width and thickness of the bilateral hemispheres, are objective abnormalities and measurements of the body based upon the coroner's physical examination, and can all be confirmed or corroborated. They are not subjective opinions based upon objective findings. Instead, they are objective findings themselves. Therefore, Dr. Mareska was required to accept these objective findings of the coroner. He did not do so, in violation of *Wallace*.

{¶ 71} In its April 14, 2021, order, in addressing *Wallace* as it relates to Dr. Mareska's refusal to accept some of the autopsy findings because they were incongruent, inconsistent, inaccurate, and unreliable, the commission found, "the *Wallace* decision does not require a reviewing physician to blindly accept medical findings on file which the physician identifies as inconsistent, if the physician provides an explanation for that opinion." The magistrate can find no authority for this proposition. Indeed, the decision in *Wallace* requires a reviewing physician to accept the objective medical findings. *Wallace* does not imply any exception for inconsistent objective findings or an allowance for rejection of objective findings as long as the reviewing physician provides an explanation, and the magistrate can find no cases declaring or applying such an exception to *Wallace*. As this court explained in *Caldwell*, "[i]t is undisputed that a physician conducting a file review must accept all * * * [of] the objective findings of the examining physician." *Id.* at appendix. *See also Wallace* at 59 ("the non-examining physician is required to expressly accept all the findings of the examining physicians[.]").

{¶ 72} Therefore, the magistrate finds that Dr. Mareska's April 26, 2020, report and March 8, 2021, addendum report cannot constitute some evidence, as Dr. Mareska did not

comply with *Wallace*. The commission's reliance upon Dr. Mareska's reports was pervasive throughout the commission's decision, and the commission relied solely upon Dr. Mareska's reports in denying compensation for loss of use of both arms and legs, loss of vision in both eyes, and loss of hearing in both ears. Because Dr. Mareska's reports must be removed from consideration, the matter must be returned to the commission for a redetermination of claimant's request for compensation.

{¶ 73} Accordingly, the magistrate recommends that this court grant a limited writ of mandamus directing the commission to vacate its April 14, 2021, order and issue an order determining, consistent with law and this decision, whether claimant has established a loss of use of both arms and legs, loss of vision in both eyes, and loss of hearing in both ears, pursuant to R.C. 4123.57(B), with regard to decedent, and to enter an order granting or denying compensation for such.

/S/ MAGISTRATE
THOMAS W. SCHOLL III

**NOTICE TO THE PARTIES**

Civ.R. 53(D)(3)(a)(iii) provides that a party shall not assign as error on appeal the court's adoption of any factual finding or legal conclusion, whether or not specifically designated as a finding of fact or conclusion of law under Civ.R. 53(D)(3)(a)(ii), unless the party timely and specifically objects to that factual finding or legal conclusion as required by Civ.R. 53(D)(3)(b).